Not for Publication

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**CHRISTINE T. SHELTON,**

**Shelton,**

**v.**                                              **Case No:   6:17-cv-1842-Orl-28KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**

---

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by Christine T. Shelton seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits, Doc. No. 1, the answer and certified copy of the record before the Social Security Administration ("SSA"), Doc. Nos. 11, 13, and the parties' Joint Memorandum,[1] Doc. No. 15.

## PROCEDURAL HISTORY.

In 2011, Shelton filed an application for benefits under the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401, *et seq.*   She alleged that she became disabled on June 1, 2006.   R. 152-53.

---

[1] I required counsel for the parties to submit a single, Joint Memorandum with an agreed statement of the pertinent facts in the record.   Doc. No. 14.   Counsel did not comply with the Scheduling Order because they failed to include all of the facts on which they rely in their arguments in the agreed statements of facts.   I have, nevertheless, considered the facts interspersed throughout the arguments in making this Report and Recommendation.

Not for Publication

Her application was denied originally, on reconsideration, by an Administrative Law Judge ("ALJ") following a hearing, and by the Appeals Council.   Shelton appealed the decision to this Court.   On August 25, 2015, I issued an order reversing the final decision of the Commissioner and remanding the case for further proceedings.   R. 563-80 (*Shelton v. Comm'r of Soc. Sec.*, No. 6:14-cv-711-Orl-KRS, Doc. No. 18 (M.D. Fla. Aug. 25, 2015)).   Thereafter, the Appeals Council vacated the ALJ's original decision and remanded the case for further proceedings.   R. 560-61.

On remand, the ALJ held a hearing on August 10, 2017 at which Shelton, accompanied by an attorney, Leonard Rubin, M.D., a medical expert, and a vocational expert ("VE") testified.   R. 606-39.   After consideration of the record as a whole, the ALJ issued a new decision on August 24, 2017.   R. 533-50.

The ALJ found that Shelton was insured under OASDI through June 30, 2010.   The ALJ concluded that Shelton had not engaged in substantial gainful activity during the period from her alleged disability onset date of June 1, 2006 through her date last insured of June 30, 2010.   R. 535–36.

The ALJ found that Shelton had the following severe impairments: disorders of the spine; a right knee impairment; migraines; and an affective disorder.   These impairments, individually and in combination, did not meet or equal a listed impairment.   R. 536.   The ALJ found that Shelton had the residual functional capacity ("RFC") to perform light exertional work except that

> she needed to avoid ladders or unprotected heights; needed to avoid the proximity to heavy, moving machinery; needed a low-stress work environment, meaning no production line; needed simple tasks; could occasionally bend, crouch, kneel, or stoop; needed to avoid squatting or crawling; needed to avoid the push/pull of arm controls; and needed to avoid the operation of foot controls.

R. 538.   The ALJ stated that he accounted for Shelton's migraine headaches and disorders of the spine by including limitations in the RFC.   R. 546.

In making this RFC assessment, the ALJ found that Shelton's reports of her limitations were not entirely consistent with the evidence in the record.   R. 544.[2]   The ALJ gave some to great weight to the opinions of Dr. Rubin, the ME.   He gave little weight to the functional capacity opinions of Alyn L. Benezette, D.O., a treating neurologist.   R. 547.

The ALJ determined that Shelton could not return to her past relevant work as an outside deliverer and animal caretaker.   R. 548.   After considering the testimony of the VE, the ALJ concluded there were light and sedentary, unskilled jobs available in the national economy that Shelton could perform, specifically Route Clerk; Marker II; Surveillance System Monitor; and Addresser.   R. 549.   Therefore, the ALJ concluded that Shelton was not disabled.   R. 550.

Shelton did not file exceptions to the decision on remand with the Appeals Council.   She now seeks review of the final decision of the Commissioner by this Court.

## JURISDICTION AND STANDARD OF REVIEW.

Shelton having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).   A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

---

[2] Shelton does not challenge this credibility assessment in the Joint Memorandum.

Not for Publication

## SUMMARY OF THE FACTS.

After a thorough review of the record, I find that some of the relevant facts are adequately stated in the parties' Joint Memorandum and in the ALJ's decision, which statement of facts I incorporate by reference.   Accordingly, I will only summarize the record relevant to the issues presented in order to protect Shelton's privacy to the extent possible.

Shelton was born in 1964.   R. 152, 623.   She completed high school and some college. R. 40, 623-24.   She had previously worked as a courier and animal care worker.   R. 41, 54, 181. She was let go from her courier job because vision problems associated with migraines affected her driving.   R. 625.   Nevertheless, she continued to drive even when she had a bad week.   *Id.*

Shelton testified that she did some housework, but that her husband would do the majority of it.   She would do some laundry and prepare food in a microwave, and sometimes she would sweep and mop.   R. 42, 626.   She would go out to eat, read, watch television, listen to the radio, use the computer, and visit with friends.   She would sometimes go the grocery store with her husband, but she could not carry heavy packages.   R. 43-44, 627-28.   She was able to dress herself, and bathe or shower.   R. 44-45, 629.

Shelton testified that she has stuttered since elementary school.   She tried not to use a telephone because she did not speak clearly.   R. 630.

Shelton experienced migraine headaches with dizziness since her 20s.   *Id.*   During the ALJ's first hearing, Shelton testified that she would have headaches every day, and that she would have severe headaches every two weeks.   R. 45.   When she would have severe headaches, they would last for days, and she would have dizziness, blind spots, fatigue, sensitivity to light and disorientation.   R. 45-46.[3]

---

[3] During the first hearing before the ALJ, Shelton testified that suffered from pain in her right knee, her left leg, and her lower back.   R. 49-51.   During the second hearing before the ALJ, she did not include

Not for Publication

The medical evidence reflects that, on July 29, 2008, Shelton saw Dr. Benezette at Coastal Neurology, Rehabilitation and Pain Management Center for evaluation and treatment of her migraine headaches and dizziness.   R. 279-81.   Dr. Benezette is a board-certified neurologist.[4] Shelton reported a twenty-year history of headaches with light sensitivity.   R. 279.   Dr. Benezette noted that Shelton had a full range of motion and no tenderness in her cervical, thoracic, and lumber spine and full range of motion in her upper and lower extremities.   R. 280.   Dr. Benezette's impressions were: (1) migraine headaches, rule out menstrually associated migraines; and (2) disequilibrium, most likely secondary to her migraine headaches, rule out benign paroxysmal positional vertigo ("BPPV").   *Id.*

On August 12, 2008, Shelton underwent a video nystagmography study and received abnormal results.   R. 292.   Dr. Benezette stated that the study was "indicative of a left greater than right peripheral vestibulopathy with an associated central vestibular dysfunction, nonlocalizing" and that "[t]hese findings suggest the patient would benefit from further vestibular therapy including Epley maneuvers."[5]   *Id.*

---

limitations from back or knee issues in her testimony.   *See* R. 633 (indicating that her testimony included all of her problems).

[4]   *Is My Doctor Board Certified?*, https://www.certificationmatters.org/is-your-doctor-board-certified -- search Alyn Benezette (last visited November 2, 2018).

[5]   "Some people experience vertigo when they change the position of their head rapidly, as when rolling their head on the pillow, looking down to tie their shoes, or looking up to reach for an item on a high shelf.   This vertigo is usually due to benign paroxysmal positional vertigo (BPPV).   It occurs when tiny calcium particles (otoconia) are displaced from their normal location to form sludge, usually in the posterior semicircular canal (one of the canals in the inner ear).   The disorder can often be cured by using the Epley maneuver to move the particles out of the canal and back to where they originated.   In this maneuver, the person's body and head are moved into different positions, one after the other.   Each position is maintained for about 30 seconds to allow the particles to move by gravity into a different part of the canal.   To check if the maneuver worked, the person moves the head in the same way that previously caused vertigo.   If vertigo does not occur, the maneuver worked.   After performing this maneuver, people should remain upright or semiupright for 1 to 2 days."   Merck Manual Consumer Version, *Benign Paroxysmal Positional Vertigo (Benign Positional Vertigo)*,   http://www.merckmanuals.com/home/ear-nose-and-throat-disorders/inner-ear-disorders/benign-paroxysmal-positional-vertigo-benign-positional-vertigo (last visited

On August 28, 2008, Shelton returned to Dr. Benezette for a follow-up examination.   R. 276-77.   Shelton reported continued complaints of dizziness and lightheadedness.   She also reported continued complaints of recurrent headaches that were bitemporal and bifrontal with throbbing severe pain and associated sinus fullness and pressure.   Shelton reported that she felt that her headaches had improved somewhat since starting Effexor.   She took her medication at night as it tended to cause daytime drowsiness.   R. 276.   Dr. Benezette noted that a previous MRI scan of Shelton's brain was unremarkable, her EEG was normal, and she had full range of motion throughout.   R. 276-77.   Dr. Benezette recommended Shelton undergo Epley maneuvers to correct BPPV.   R. 277.

On October 14, 2008, Shelton returned to Dr. Benezette for a follow-up appointment.   R. 274-75.   Dr. Benezette noted that Effexor was helping Shelton, but that Shelton stopped taking it when she developed hair loss as a side effect.   R. 274.   Shelton reported experiencing headaches on a near daily basis, and she was concerned they were related to her cervical symptoms.   She reported persistence in cervical stiffness and clicking that tended to localize to her lower cervical segments.   Shelton still complained of dizziness despite undergoing Epley maneuvers.   Upon examination, Shelton had a "fairly good range of motion" in her cervical, thoracic, and lumbar spine and "mild tenderness" at C5-6 with active range of motion.   *Id.*   Dr. Benezette recommended that Shelton undergo an MRI of her cervical spine to document cervical spondylosis and/or disc disease to account for her headaches.   R. 275.   Dr. Benezette noted that Shelton was not interested in beginning any further medication "which could potentially cause untoward side effects" until undergoing an MRI of the cervical spine.   *Id.*

On October 29, 2008, an MRI scan of Shelton's cervical spine revealed "anterior and

November 2, 2018).

posterior osteophytic ridging at C5-6 with mild bilateral foraminal narrowing.   There was also anterior and posterior osteophytic ridging seen at C6-7 with mild spinal stenosis and moderate left foramen narrowing, as well as mild to moderate right neural foramen narrowing."   R. 272; *accord* R. 291.   The impression was mild spinal stenosis at C5-C6 and C6-C7.   R. 291.   On November 11, 2008, Dr. Benezette noted that Shelton had a "fairly good" range of motion throughout her cervical, thoracic, and lumbar spine and mild tenderness at C5-6.   R. 272.

On December 31, 2008, Shelton returned to Dr. Benezette for a follow-up examination for her headaches and dizziness.   R. 270-71.   Shelton reported that her symptoms were still present but improved since she started on a low dose of Keppra.   R. 270.   Dr. Benezette recommended that she increase her dosage of Keppra in an effort to improve her headaches and reduce her complaints of dizziness.   R. 271.

On February 5, 2009, Shelton returned to Dr. Benezette for a follow-up examination for her headaches and dizziness.   R. 268-69.   Shelton reported complaints of continued daily headaches.   R. 268.   She also reported that her dizziness had improved but that her headache symptoms had not improved since increasing the dose of Keppra.   She was still having problems with vertiginous symptoms with head and neck movement.   Physical examination revealed a "fairly good" range of motion throughout her cervical, thoracic, and lumbar spine, but spasm and tenderness over the left paravertebral musculature of the cervical spine, particularly at the C3-4 level.   *Id.*

On February 26, 2009, Shelton presented to Ralph J. Zwolinski, M.D., with complaints of ongoing dizziness and migraines.   R. 243-45.   Dr. Zwolinski is also a board-certified neurologist.[6]   Shelton reported that since beginning long-term birth control, her headaches were

---

[6] *Is My Doctor Board Certified?*, https://www.certificationmatters.org/is-your-doctor-board-certified -- search Ralph Zwolinski (last visited November 2, 2018).

substantially reduced.   She also stated that her headaches were well controlled when she used Imitrex.   R. 243.   At best, she experienced less than ten headaches per month, which Dr. Zwolinski noted did not meet the criteria for a chronic headache.   R. 244.   Shelton further reported that Keppra was helpful for her symptoms.   R. 243.   Dr. Zwolinski noted that Shelton had a good range of motion of the cervical spine in all planes but experienced dizziness with hyperextension.   R. 244.   Dr. Zwolinski's assessment was disequilibrium secondary to BPPV, which was refractory, menstrual migrainous headaches and cervical spondylosis.   R. 244.   Dr. Zwolinski noted that Shelton got "complete relief" from headaches when she used Imitrex and that her migraine headaches have "come under very good control" through Dr. Benezette's care.   R. 244-45.

On April 7, 2009, Shelton returned to Dr. Benezette for a follow-up examination for her headaches and dizziness.   R. 266-67.   Shelton reported that she was constantly lightheaded and experienced associated photophobia.   R. 266.   Dr. Benezette discontinued Keppra and gave Shelton a trial of Norvasc with instructions to increase the dose as tolerated in an effort to improve her symptoms.   Dr. Benezette instructed Shelton to continue to use Imitrex as abortive therapy at the onset of a headache.   R. 267.   At a follow-up appointment on May 6, 2009, Shelton reported her lightheadedness and headaches had improved since starting the Norvasc and denied any untoward side effects from the medication.   Dr. Benezette observed that Shelton's speech was clear.   R. 264.

Treatment notes from Jose Gierbolini, M.D., Shelton's primary care physician, show diagnoses of depression and stuttering in 2009.   R. 376, 383.   In October 2009, Dr. Gierbolini noted that Shelton was doing well with medication for depression, which was stable, and that her stuttering was stable.   R. 376.   Shelton reported experiencing one disabling headache every three

months.   *Id.*

On September 16, 2009, Shelton returned to Dr. Benezette for a follow-up examination for her headaches and dizziness.   R. 262-63.   Shelton reported experiencing approximately five moderate to severe headaches per month.   R. 262.   She reported that she felt that Norvasc had helped reduce the frequency and severity of her headaches.   *Id.*   Dr. Benezette again noted a fairly good range of motion in Shelton's cervical, thoracic, and lumbar spine.   *Id.*   Dr. Benezette observed that Shelton's speech was clear.   Dr. Benezette told Shelton to increase her Norvasc dosage and recommended she continue to use Imitrex as abortive therapy for her headaches.   R. 263.

On November 17, 2009, Shelton returned to Dr. Benezette for a follow-up examination for her headaches and dizziness.   R. 260-61.   She reported experiencing headaches that were characterized by a dull, generalized head pain with burning eyes.   There was no improvement of her headaches despite increasing the dosage of Norvasc.   Shelton reported that her dizziness and nasal symptoms had resolved.   R. 260.   Dr. Benezette discontinued Norvasc and prescribed Verapamil.   R. 261.   Dr. Benezette observed that Shelton's speech was clear.   R. 260.

On August 4, 2010, after the date she was last insured, Shelton returned to Dr. Benezette for a follow-up examination for her headaches and neck pain.   R. 258-59.   Shelton reported that she was still experiencing headaches at least every other day despite taking Verapamil.   She stopped taking Verapamil and requested a muscle relaxer to treat her cervical symptoms in an effort to reduce her headache frequency.   She reported she was able to abort most headaches using Imitrex.   R. 258.   Dr. Benezette noted Shelton had a fairly good range of motion in her cervical, thoracic, and lumbar spine with mild spasm and tenderness of the muscles of the lower cervical and upper thoracic spine.   *Id.*   Dr. Benezette ordered an MRI of the cervical spine to document

any progression of cervical disc disease.   R. 259.   Dr. Benezette also observed that Shelton's speech was clear.   *Id.*

On October 5, 2010, Shelton returned to Dr. Benezette for a follow-up examination for her headaches and neck pain.   R. 256-57.   Shelton reported that she was unable to get an MRI of her cervical spine as her insurance company had denied it.   R. 256.   Dr. Benezette ordered a short course of physical therapy in an effort to improve her symptoms.   R. 257.

On November 8, 2010, Shelton returned to Dr. Benezette for a follow-up examination for her headaches and neck pain.   R. 253-54.   Shelton reported her symptoms were unchanged and persisted with constant neck pain, stiffness, and headaches that localized to the cervico-occipital head regions, left greater than right, despite undergoing physical therapy and a trial of a muscle relaxant.   R. 253.   Dr. Benezette ordered an MRI of her cervical spine.   R. 254.

On December 8, 2010, Shelton returned to Dr. Benezette for a follow-up examination for her headaches and neck pain.   R. 251-52.   Shelton reported experiencing continued daily headaches.   She reported that she was able to abort a very severe headache with Imitrex.   Shelton also reported a persistent, dull pain with stiffness and spasm throughout her cervical spine.   R. 251.   Dr. Benezette told Shelton to discontinue the over-the-counter ibuprofen and begin a trial of Arthrotec.   Dr. Benezette opined that Shelton was "unable to work now or in the foreseeable future due to her symptoms."   R. 252.

On January 6, 2011, Shelton returned to Dr. Benezette for a follow-up examination for her headaches and neck pain.   R. 248-49.   Shelton reported that she continued to suffer from daily headaches and she was experiencing more episodes of headaches associated with mild disorientation.   R. 248.   Dr. Benezette ordered an MRI of the brain and an EEG, after noting that previous studies were normal.   R. 248-49.

On February 4, 2011, an SSA field office representative interviewed Shelton.   The representative wrote that Shelton had difficulty talking due to a severe stutter.   R. 170.

On February 10, 2011, an MRI of Shelton's brain revealed "[a]t least 4 areas of signal abnormality identified within the white matter representing areas of demyelination," no abnormal enhancement or significant mass effect, and "[m]axillary sinus disease."   R. 290.   Shelton's EEG, which was performed on February 11, 2011, was normal.   *See* R. 359.

On February 25, 2011, Shelton returned to Dr. Benezette for a follow-up examination for her headaches.   R. 359-60.   She reported experiencing continued daily headaches.   R. 359.   Dr. Benezette ordered a lumbar puncture to assess cerebrospinal fluid for an underlying demyelinating disorder such as multiple sclerosis.   R. 360.

On March 15, 2011, Shelton underwent lumbar puncture surgery to drain spinal fluid.   R. 349.   On March 17, 2011, Shelton returned to the emergency room with complaints of a constant headache since the procedure, but she thereafter reported that the headache had resolved and she was discharged the same day.   R. 342, 344.   On March 18, 2011, Shelton again sought emergency department treatment for a headache with nausea.   R. 345.

On March 24, 2011, Shelton returned to Dr. Benezette for a follow-up examination for her headaches.   R. 356-57.   Dr. Benezette reported that Shelton's March 15, 2011 lumbar puncture revealed normal opening pressure as well as normal cerebrospinal fluid.   R. 356.   Dr. Benezette further noted that Shelton's blood work and visual and auditory examinations were normal.   R. 356.   Shelton reported no improvement in her symptoms despite taking Lamictal.   Shelton reported that Lamictal, even at a low dose, was causing vivid dreams, and she wanted to discontinue the medication.   *Id.*

On June 28, 2011, Shelton returned to Dr. Benezette for a follow-up examination for her

Not for Publication

headaches.   R. 477-78.   She reported experiencing continued headaches and paroxysms of sudden disorientation and dizziness with varying lengths of time.   She reported she was able to abort most headaches using Imitrex.   R. 477.   Dr. Benezette ordered a repeat MRI of her brain to document any change in apparent white matter lesions as compared to her previous MRI done on February 10, 2011.   R. 478.

On August 25, 2011, Shelton returned to Dr. Benezette for a follow-up examination for her headaches.   R. 482-83.   She reported experiencing daily headaches that were becoming more debilitating.   R. 482.   Dr. Benezette ordered a repeat MRI of her cervical spine and prescribed Mobic.   R. 483.

On September 20, 2011, Shelton returned to Dr. Benezette for a follow-up examination for her headaches.   R. 480-81.   She reported experiencing continued headaches.   R. 480.   Dr. Benezette noted that the findings of Shelton's September 16, 2011 cervical spine MRI were essentially unchanged from her previous MRI in 2010.   *Id.*   Dr. Benezette gave Shelton a trial of Migravent for headache prophylaxis.   R. 481.

On April 11, 2012, Shelton returned to Dr. Benezette for a follow-up examination for her headaches.   R. 487-88.   Shelton reported frequent events of altered mental status.   R. 487.   Dr. Benezette's impression was "[c]omplex migraine, rule out partial seizure event versus autoimmune disorder."   R. 488.

On May 10, 2012, Shelton returned to Dr. Benezette for a follow-up examination for her headaches.   R. 503-04.   Dr. Benezette opined that Shelton was "permanently and totally disabled, unable to return to any type of gainful employment now or in the foreseeable future."   R. 504. On that same day, Dr. Benezette completed a residual functional capacity questionnaire for Shelton.   R. 491-94.   He noted that Shelton suffered from basilar migraines that were associated

with an altered mental status, slurred speech, lightheadedness, dizziness, vertigo, nausea/vomiting, malaise, photosensitivity, inability to concentrate, visual disturbances, mood changes and mental confusion.   Dr. Benezette noted that Shelton was experiencing about two headaches per month that typically lasted 120 hours.   R. 491.   Dr. Benezette noted that menstruation and strong odors triggered Shelton's headaches and that bright lights, coughing, straining/bowel movements, and moving around made her headaches worse.   He noted that lying down and medications helped improve her headaches.   Dr. Benezette did not identify any positive test results or objective signs of Shelton's headaches.   R. 492.   Dr. Benezette opined that Shelton's impairments were reasonably consistent with the symptoms and functional limitations described in his evaluation. He noted that Shelton had not had a response to treatment thus far.   R. 493.

Dr. Benezette opined that Shelton's prognosis was poor and she would generally be precluded from performing even basic work activities.   *Id.*   He opined that Shelton was incapable of performing even low stress jobs as stress could precipitate and/or aggravate her headache symptoms.   R. 494.   Dr. Benezette opined that Shelton would experience "good days" and "bad days," and she would likely be absent from work more than four days per month as a result of her impairments or treatment.   He also opined that Shelton had a limited ability to sit, stand, walk, lift, bend, stoop and crouch due to cervical disc disease and degenerative joint disease of the knees.   *Id.*   Dr. Benezette opined that the severity of Shelton's symptoms was the same as it was in 2008.   R. 491.

On July 23, 2012, David A. Mallory, D.C., wrote a letter to Dr. Gierbolini regarding his treatment of Shelton.   He stated that at that time Shelton experienced daily headaches, which were usually improved with medication.   Her lower back pain began about one year earlier.   Sitting too long or standing for more than ten minutes increased the pain, but her activities of daily living

generally improved as the day progressed.   Shelton was able to perform elliptical exercise without exacerbation.   R. 894.   Dr. Mallory indicated that he would be administrating a program of chiropractic management, including adjustive techniques and exercise instructions, to Shelton for the next four weeks.   R. 895.

Dr. Rubin summarized the medical records during the alleged disability period—June 1, 2006 through June 30, 2010—during the hearing after remand.   Dr. Rubin is a board-certified general internist.   R. 609.   Dr. Rubin opined that the results of the video nystagmography study show that Shelton's dizziness arose from a problem in her ear.   He stated that a neurologist would be better able to give specifics of the study.   R. 613, 617.   He testified based on the medical evidence that Shelton would have no limitations on sitting, standing or walking.   Shelton should not climb ladders or scaffolds due to dizziness.   R. 614, 617.   As for Dr. Benezette's May 10, 2012 functional capacity assessment, Dr. Rubin testified that Shelton's cervical disc disease would not impose the degree of restriction identified by Dr. Benezette.   R. 616.[7]

Finally, during the hearing on remand, the ALJ asked the VE to assume a hypothetical individual of Shelton's age, education and previous work experience with the RFC that the ALJ found applied to Shelton.   R. 635-36.    The VE testified that this hypothetical individual would not be able to perform any of Shelton's past relevant work.   R. 635.   The VE testified that this hypothetical person could perform light and sedentary, unskilled (SVP 2) jobs available in the national economy, including route clerk (DOT 222.687-022); marker II (DOT 920.687-126); surveillance system monitor (DOT 379.367-101); and addresser (DOT 209.587-101).   R. 636.   The VE testified that his testimony with consistent with the DOT (*Dictionary of Occupational Titles*) except that he relied on his thirty-one years of experience as a rehabilitation counselor to

---

[7] The assessment is relevant to the alleged disability period because Dr. Benezette opined that Shelton's condition was the same in 2008.

Not for Publication

testify about limitations arising from absenteeism and off-task behavior.   R. 637.

## ANALYSIS.

In the Joint Memorandum, which I have reviewed, Shelton asserts three assignments of error.   First, she argues that the ALJ erred in giving little weight to the opinions of Dr. Benezette, a treating physician.   Second, she contends that the ALJ erred by giving some to great weight to the opinions of Dr. Rubin, because he had not examined Shelton.   Finally, she submits that the ALJ erred by failing to include limitations from her speech impairment in the RFC assessment and in hypothetical questions to the VE.   Doc. No. 15.   I will address these issues in turn.

### *Opinions of Dr. Benezette.*

Dr. Benezette treated Shelton for migraine headaches and dizziness from 2008 through 2012.   He was, therefore, a treating physician with a detailed, longitudinal history of Shelton's condition.   *See* 20 C.F.R. § 404.1527(c)(2).   He is also a board-certified neurologist rendering treatment in his area of specialty.   SSA regulations indicate that more weight should be given to the opinion of a specialist about a medical issue related to his area of specialty.   *Id.* § 404.1527(c)(5).

The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary."   *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).   Good cause exists when (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's medical records.   *Id.* at 1240-41.   The ALJ must articulate the reasons for giving less weight to the opinion of a treating physician.   *Lewis*, 125 F.3d at 1440.

The ALJ gave little weight to Dr. Benezette's May 10, 2012 functional capacity assessment

Not for Publication

because it was rendered almost two years after the date Shelton was last insured, it was not supported by the record as a whole, and Dr. Rubin testified that the assessment was not supported by the objective evidence in the record.   With respect to limitations arising from migraine headaches, the ALJ further noted that Dr. Benezette's conclusions were inconsistent with Shelton's reports that migraines were controlled on Imitrex and that her dizziness had completely resolved as of November 2009.   Additionally, the ALJ observed that Dr. Benezette's opinion was inconsistent with Dr. Mallory's letter, which indicated that Shelton's activities of daily living improved as the day progressed and that she was able to exercise without exacerbation of her symptoms from headaches and back pain.   R. 547.

All of the reasons cited by the ALJ are supported by substantial evidence in the record. Dr. Benezette's finding on examination during the alleged disability period showed fairly good range of motion in the cervical spine.   Shelton reported that medication improved the headache symptoms, and she told Dr. Zwolinski in February 2009 that the headache symptoms had been completely relieved.   Shelton told Dr. Gierbolini in October 2009 that she experienced a headache only once every three months.   Shelton also reported that her dizziness was resolved in November 2009.   To the extent that Shelton's testimony reflects greater limitations than those she reported to physicians, I note that she does not challenge in the Joint Memorandum the ALJ's finding that her reports of subjective symptoms were not entirely consistent with the record as a whole.

Because Dr. Benezette's opinions are not supported by his own treatment notes or the record as a whole, and because the medical expert opined that the evidence of record does not support Dr. Benezette's functional capacity assessment, the ALJ stated good cause to give the opinions of Dr. Benezette little weight.   Therefore, I recommend that the Court find that this assignment of error is not well taken.

Not for Publication

*Opinions of Dr. Rubin*.

Shelton argues that the ALJ erred in giving some to great weight to the opinions of Dr. Rubin because he did not examine her.   Her counsel cites cases in which physicians hired by the Office of Disability Determinations render opinions on form functional capacity assessments after review of the record available at the time the review is conducted.   In contrast, Dr. Rubin is a board-certified internist who rendered his opinion through detailed testimony based on his review of the record as a whole.

The law permits an ALJ to give greater weight to the opinion of a reviewing physician when, as here, the ALJ has properly given less than considerable weight to the opinion of a treating physician.   "[A]fter independently discounting a treating physician's opinion, all of the medical sources in the record are put on an equal plane and the ALJ accords them weight pursuant to the factors enumerated in 20 C.F.R. § 404.1527.   At this point, the opinions of non-examining sources may be accorded greater weight than those of examining sources."   *Hicks v. Colvin*, No. 1:12-cv-1663-JEC, 2014 WL 3573732, at *8 (N.D. Ga. July 21, 2014) (citing *Lamb*, 847 F.2d at 703).

For these reasons, I recommend that the Court find that the ALJ did not err by giving some to great weight to the opinions of Dr. Rubin.

*Speech Impairment*.

Shelton also argues that the ALJ erred by failing to include in the RFC assessment and in hypothetical questions to the VE her speech impairment, specifically stuttering.   In the decision under review, however, the ALJ did not find that Shelton had a severe speech impairment.   While the record reflects that Shelton did stutter, Dr. Benezette's records show that her speech was clear. Further, Shelton testified that her stuttering developed in elementary school, but she was able to

complete some college and perform past relevant work as a courier and animal care worker despite this impediment.[8]

Even if Shelton had established that her stuttering was a severe impairment, she has not shown that the ALJ's failure to include it in the RFC assessment and the hypothetical questions to the VE was error.   The ALJ discussed evidence of stuttering in various parts of his decision.   *See, e.g.*, R. 538, 544.   Counsel for the Commissioner correctly argues that at least one of the jobs that the ALJ found that Shelton could perform does not require talking.   The DOT describes the job of Marker II as including the ability to "[s]peak simple sentences, using normal word order, and present and past tenses," but it indicates that talking is not required in the job.   DICOT 920.687-126, 1991 WL 687992.[9]

For these reasons, I recommend that the Court find that the ALJ did not commit reversible error by failing to include stuttering in the RFC assessment or in the hypothetical questions to the VE.

### RECOMMENDATIONS.

For the reasons stated above, I **RESPECTFULLY RECOMMEND** the final decision of the Commissioner be **AFFIRMED**.   I further **RECOMMEND** that the Court direct the Clerk of Court to issue a judgment consistent with the Order on this Report and Recommendation and, thereafter, to close the file.

---

[8] Notably, the DOT description of the job of Deliverer, Outside requires the ability to "[s]peak clearly and distinctly with appropriate pauses and emphasis," and requires talking occasionally (up to 1/3 of the time).   DICOT 230.663-010, 1991 WL 672160.   The DOT description of Animal Caretaker requires the ability to "[s]peak simple sentences, using normal word order, and present and past tenses," and requires frequent talking (1/3 to 2/3 of the time). DICOT 410.674-010, 1991 WL 673401.

[9] In contrast, the job of Surveillance System Monitor requires the ability to "[s]peak before an audience with poise, voice control, and confidence, using correct English and a well-modulated voice" and requires frequent talking (1/3 to 2/3 of the time).   DICOT 379.367-010, 1991 WL 673244.

Not for Publication

**Notice to the Parties.**

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.   A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   *See* 11th Cir. R. 3-1.

**Respectfully recommended** in Orlando, Florida on November 5, 2018.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE